**EXHIBIT A**



AUG 0 9 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

```
ASHLEY ADAMS                    :
716 North Barrett Lane          :
Christiana, DE  19702           :
                                :
          Plaintiff,            : No. 04-251 JJF
                                :
     v.                         : NON-ARBITRATION CASE
                                :
JO ELLEN CHAPEN SHELDON         : JURY TRIAL DEMANDED
708 Pebble Beach Drive          :
Elkton, MD  21921               :
                                :
          Defendant.            :
```

Video Conference Deposition of **JO ELLEN CHAPEN SHELDON,** taken pursuant to notice, before CAROL DiSERAFINO, Professional Reporter and Notary Public, duly authorized to administer oaths, on **WEDNESDAY, JULY 6, 2005, at 2:41 p.m.**, held at the offices of Parcels, Inc., 103 West 7th Street, Wilmington, Delaware.  There being present:


APPEARANCES:

    **CHARLES S. COOPER, ESQ.**
      COOPER & SCHALL, P.A.
    1760 Market Street, Ste. 1100
    Philadelphia, Pennsylvania  19103
    Attorney for Plaintiff

    **BETH H. CHRISTMAN, ESQ.**
      CASARINO CHRISTMAN & SHALK, P.A.
    800 North King Street, Ste. 200
    Wilmington, Delaware  19899
    Attorney for Defendant

ALSO PRESENT:

    Ms. Ashley Adams

Case 1:04-cv-00251-JJF    Document 108-4    Filed 10/03/2007    Page 3 of 17

2

## INDEX TO TESTIMONY

DEPOSITION OF:                                              PAGE

JO ELLEN CHAPEN SHELDON

    Direct by Mr. Cooper                                    3


- - -


## INDEX TO EXHIBITS

SHELDON EXHIBIT NO.:                                        PAGE

1    Copy of Police Report                                  3

2    Color copy of Photograph                              21

```
 1              (Deposition Exhibit Sheldon No. 1
 2    premarked for identification).
 3                        -  -  -
 4              JO ELLEN CHAPEN SHELDON, being
 5         first duly sworn/affirmed according to
 6         law, was examined and testified as
 7         follows:
 8                        -  -  -
 9    BY MR. COOPER:
10         Q.      Miss Sheldon, my name is -- can you hear
11    me okay?
12         A.      I can.
13         Q.      My name is Charles Cooper.  I'm going to
14    ask you some questions today.  I represent Ashley
15    Adams concerning an accident that happened back in
16    April of 2002.  The purpose of my questions today is
17    not to confuse you or mix you up, and there's an
18    attorney seated to my left, Beth Christman, who is
19    going to be here and if there's any objection, she'll
20    make the proper objections.  All I want to do is get
21    an understanding about how the accident happened and
22    if at any time you don't understand my questions,
23    please let me know and I'll repeat them.
24              If you don't know the answer to a
```

1  question, I want you to say you don't know.  Nobody
2  wants you to guess.  We're just trying to get some
3  answers about how the accident happened.  Do you
4  understand those instructions?
5          A.    I do.
6          Q.    Another thing is you have to keep your
7  answers verbal because the Court Reporter can't take
8  down a nod of your head or a wave of your hand, and
9  even though you may know what I'm going to ask before
10 I'm done asking, you have to wait till I'm done asking
11 the questions because the Court Reporter can't take
12 down both of us talking at the same time.  Do you
13 understand that?
14         A.    I do.
15         Q.    I'm going to ask you some questions
16 about an accident that happened on April 23rd of 2002.
17 Do you remember an accident happening on that day?
18         A.    Yes.
19         Q.    Do you remember what time of day the
20 accident happened?
21         A.    I would say approximately 8 a.m.
22         Q.    And where were you coming from at the
23 time of the accident?
24         A.    I was coming from my house.

```
 1         Q.    And how far do you live from the place
 2   where the accident happened?
 3         A.    I would say between two and four miles.
 4         Q.    And do you remember what time you left
 5   your home that morning?
 6         A.    Probably 7:55.
 7         Q.    And the place where this accident
 8   happened on Old Baltimore Pike, are you familiar with
 9   that geographical location?
10         A.    Yes, I am.
11         Q.    Had you traveled through the area where
12   the accident happened at any time prior to the
13   happening of the accident?
14         A.    Yes.
15         Q.    And how often would you have done that?
16         A.    Several times a day.
17         Q.    And for how long of a period of time?
18   Was it years that you were doing that or months or
19   days?
20         A.    Um, at least two years.
21         Q.    Were you employed on the date of the
22   accident?
23         A.    Yes, I was.
24         Q.    And for whom were you employed?
```

1        A.    JP Morgan Chase Private Bank.

2        Q.    What was your job title at JP Morgan?

3        A.    Client services.

4        Q.    And, generally speaking, what sort of
5   work did that job entail?

6        A.    Banking for private wealthy individuals.

7        Q.    And for how long a period of time did
8   you hold that position?

9        A.    From February of 2000 through February
10  of 2003.

11       Q.    What time did you have to be at work
12  that morning?

13       A.    Between 8:15 and 8:30.

14       Q.    What were the traffic conditions like
15  when you left your home?

16       A.    At my house it would have been sparse.
17  Towards the intersection where the accident was it
18  would have begun to have gotten heavier.

19       Q.    The place where the accident happened,
20  how far is that from your location of employment?

21       A.    I don't honestly know.  I would think
22  maybe ten miles but I'm not sure.

23       Q.    So how long do you figure it would have
24  taken you from the place where the accident happened

1  for you to get to work?  How long in your mind would
2  it have taken you to get there, to work that morning,
3  had the accident not happened?
4        A.    Between fifteen and twenty minutes.
5        Q.    Back in April of 2002 did you own a cell
6  phone?
7        A.    Yes, I did.
8        Q.    And did you use that cell phone at any
9  time prior to the collision taking place in this
10 accident?
11             MS. CHRISTMAN:  Are you asking her
12 during the drive?
13             MR. COOPER:  Yeah.
14 BY MR. COOPER:
15       Q.    I guess what I'm asking is, from the
16 point you got in your vehicle that morning before the
17 accident happened and the actual taking place of the
18 accident did you operate your cell phone?
19       A.    I don't know.
20       Q.    Do you know whether or not at the point
21 in time that you hit my client's vehicle that you were
22 actually on the cell phone?  Do you remember one way
23 or another?
24       A.    I don't remember.

```
 1        Q.    Who was your cell phone company back in
 2   April of '02?
 3        A.    Verizon.
 4        Q.    Was the account through your name,
 5   Ms. Sheldon?
 6        A.    No.  It would have been in my husband's.
 7   David.
 8        Q.    Is that David Sheldon?
 9        A.    Correct.
10        Q.    Was your address back then 708 Pebble
11   Beach Drive, Elkton, Maryland, 21921?
12        A.    No.
13        Q.    Okay.  What was your address back when
14   the accident happened, please?
15        A.    254-1 East Main Street, Elkton,
16   Maryland, 21921.
17        Q.    Would that be the address that the
18   account would be listed under?
19        A.    At that time, yes.
20        Q.    Where do you live now?
21        A.    I live in Grayson, Georgia.
22        Q.    Can you tell me your address, please.
23        A.    1831 Shoreline Trace, Grayson.
24        Q.    Can you tell me your Social Security
```

1  number.

2           MS. CHRISTMAN:  I'm going to object.  I

3  don't think that's relevant at this time.

4           MR. COOPER:  I'm not -- the only reason

5  I'm asking is so I can identify -- I want to get the

6  records for the cell phone.  I'm not interested in

7  invading her privacy, so if you want to get it for me,

8  you can.  I'm just wondering -- I'm thinking in my

9  mind how I would get it and I'm thinking it might be

10 linked to a date of birth or a Social number, but --

11          MS. CHRISTMAN:  It's not in her name

12 anyway, so it -- but we can provide you with the

13 information you need to obtain those cell phone

14 records separately.

15          MR. COOPER:  Okay.  Thank you.

16 BY MR. COOPER:

17      Q.    It would be in your husband's name, I

18 presume?  David?

19      A.    Yes.

20      Q.    But your counsel has told me that she

21 will allow me -- she'll give me the information to get

22 those records, which then I don't have to ask that

23 question about your Social Security number.

24          MS. CHRISTMAN:  And just so we're clear,

1   simply for the date and time of this accident, around
2   that time.  Not anything beyond that.
3              MR. COOPER:  Nothing beyond that.  Just
4   around the date and time of this accident to show
5   whether or not -- to help you remember better whether
6   you were actually on the cell phone at the time of the
7   accident.  That's the only purpose for this,
8   Ms. Sheldon, not to invade your privacy at all.
9   BY MR. COOPER:
10       Q.     How were you feeling the morning of the
11  accident?  Were you in good health?
12       A.     Yes.
13       Q.     Were you in any hurry to get to work
14  that morning?
15       A.     No.
16       Q.     The vehicle that you were operating, it
17  was a Volvo?
18       A.     Yes, it was.
19       Q.     And was that vehicle in good working
20  order at the time the accident happened?
21       A.     Yes, it was.
22       Q.     Were there any mechanical difficulties
23  at the time of the accident that existed for that
24  vehicle that in any way affected the way the vehicle

```
 1  drove, the way you drove the vehicle?
 2        A.    No.
 3        Q.    On the date of this accident did you
 4  wear corrective lenses?
 5        A.    No.
 6        Q.    You know what I mean by that?  Glasses.
 7  Did you need glasses to drive back then?
 8        A.    No, I do not.  Never have.
 9        Q.    Can you tell me -- trace your route for
10  me to Old Baltimore Pike where the accident happened,
11  please, that morning.
12        A.    Very simple.  I pulled out of my
13  driveway, and that is Main Street in Elkton, which
14  becomes Old Baltimore Pike.  It's a straight shot.
15        Q.    And did you make a right or a left out
16  of your driveway?  I presume the road that your house
17  is on, if you go on that road you get to Old Baltimore
18  Pike?
19        A.    Yes.  It's the same road.  I turned
20  right out of my driveway.
21        Q.    And then how far is it from that
22  location to the place where the accident happened?
23  You can give me time ... you can give me miles.
24  Whatever works for you.
```

1    A.    I believe it was two to four miles is
2  what I had stated previously.
3    Q.    And do you remember -- I believe you
4  said that the traffic conditions were somewhat sparse
5  and then got a little heavier as you got to Route 896;
6  is that right?
7    A.    Correct.
8    Q.    Now can you describe Old Baltimore Pike
9  for me?  Is it one lane in each direction when you get
10 out of your driveway?  Is it two lanes in each
11 direction?
12   A.    It's one lane in both directions going
13 the whole way from Main Street through Old Baltimore
14 Pike, excluding a turn lane one intersection up -- I'm
15 sorry, I don't recall the name of that street -- and
16 then as you pass over that, continuing on Old
17 Baltimore Pike it's still one lane both directions,
18 and where the accident occurred was one lane both
19 directions.
20   Q.    Is there a left turning lane?  The place
21 where the accident happened was Old Baltimore Pike and
22 Route 896; right?
23   A.    Correct.  We were not at the
24 intersection however.  We had not made it to the

1    intersection yet, so there was no turn lane for the
2    left yet.
3         Q.    The accident happened how many car
4    lengths from the intersection?  In other words,
5    between you and 896 there were how many cars at the
6    place where the accident happened, including my
7    client's vehicle?
8         A.    I would have to say at least fifteen, if
9    not more.  I'm not sure.
10        Q.    Do you think it was around fifteen or
11   you're not sure at all?  It could have been less than
12   that?  I don't want to put words in your mouth.
13        A.    It would not have been less than that.
14        Q.    So it was somewhere -- either fifteen or
15   more cars were between you and 896 when the collision
16   took place; correct?
17        A.    Correct.
18        Q.    And one of those fifteen cars would
19   actually be my client's vehicle; right?
20        A.    One of the fifteen or more cars.  Yes.
21        Q.    Correct.  One of the fifteen or more
22   cars.  You're correct.
23              Do you know where your vehicle was
24   located at the time you first saw my client's vehicle?

```
 1  In other words, how far from -- how far from 896 was
 2  my client's vehicle when you first saw it?
 3        A.    We were stopped at a red light.  She was
 4  directly in front of my car.
 5        Q.    Could you describe for me how the
 6  accident happened.
 7        A.    We were stopped at a red light.  My foot
 8  slipped off the brake, I rolled forward and tapped the
 9  back of her bumper.
10        Q.    How fast were you going at the time you
11  hit the back of her bumper?
12        A.    Less than 5 miles.  It did not register
13  on my speedometer.
14        Q.    And were you looking at your speedometer
15  between the time that your foot came off the brake and
16  you moved your vehicle forward and the time that you
17  impacted my client's vehicle?
18        A.    No, but the speedometer on a Volvo
19  doesn't start below 5 miles an hour.
20        Q.    When you first approached 896 is there a
21  traffic light there for your direction of travel?
22        A.    We were going towards the traffic light.
23  Is that your question?
24        Q.    Yes.  So you're traveling towards the
```

```
 1  traffic light on Old Baltimore Pike; correct?
 2       A.    Yes.
 3       Q.    And at some point in time did you have
 4  an opportunity as you're traveling towards 896 to see
 5  a traffic signal directing your direction of travel?
 6  In other words, as you're going down Old Baltimore
 7  Pike, at some point is there a traffic light that
 8  directs traffic approaching Route 896?
 9       A.    There's a traffic light with a stoplight
10  and a turn signal.
11       Q.    And where were you intending to go?
12  Were you intending to go across 896 or were you gonna
13  make a left?
14       A.    I would have made a left turn.
15       Q.    And when you stopped your vehicle, you
16  say you stopped your vehicle behind my client's
17  vehicle?
18       A.    Correct.
19       Q.    How far was the front of your vehicle
20  from the back of my client's vehicle when you stopped?
21       A.    A couple of feet?
22       Q.    Would that be five feet or less?  Ten
23  feet?
24       A.    Trying to think of a visual for a
```