1   moment, how far five feet is.  I would say probably

2   five feet or less.

3           Q.      And how long were you stopped before

4   your car moved forward into the back of my client's

5   vehicle?

6           A.      I was at a complete, total stop;

7   standstill.  I don't recall how long until my foot

8   slipped.

9           Q.      And at the time your foot slipped, was

10  the traffic signal for your direction of travel on Old

11  Baltimore Pike red, green or yellow?

12          A.      We were nowhere close to the light yet,

13  so I honestly don't know if I could see it, and I

14  haven't been back to that section so sadly I can't

15  recall how far I was from the light because it's been

16  a long time.

17          Q.      Did you bring your vehicle to a stop

18  because of the traffic light or did you bring your

19  vehicle to a stop because there was congestion?

20          A.      Because of congestion.

21          Q.      Did you notice when you brought --

22                  So can you say what color the light was

23  when you brought your vehicle to a stop?

24          A.      I would say red.

1          Q.      Did you see it, though?  Can you say one

2    way or another whether it was red, green or yellow?

3    Do you know one way or another?

4          A.      At this point I don't know.

5          Q.      Now when you first saw my client's

6    vehicle I presume it was stopped; correct?

7          A.      Yes.

8          Q.      Do you know why your foot slipped off

9    the brake?

10         A.      No.  Maybe my shoe was slippery.  I'm

11   not sure.

12         Q.      Had that ever happened in the past?

13         A.      No.

14         Q.      Now the vehicle you were operating, the

15   Volvo, would that car -- in other words, some cars

16   when you take your foot off the brake, they don't

17   move.  Other cars, you take your foot off the brake,

18   they move forward because of the way cars accelerate

19   sometimes.  I don't know much about cars, but I've

20   driven enough of them to know sometimes the engine is

21   set so if you take your foot off the brake, it moves

22   forward.  Sometimes the engine it set so if you take

23   your foot off the brake it doesn't move forward.

24                 Was your sort of vehicle the way the

1    engine was tuned able to move forward when you took

2    your foot off the brake without pressing the

3    accelerator?

4            A.      Um, I don't know that I ever paid

5    attention or thought about it.

6            Q.      All right.  Were you able --

7                    For how long a period of time had you

8    been, you know, routinely driving that vehicle prior

9    to the accident?

10           A.      We leased the car in '98 and it was

11   traded back and forth between my husband and I, so we

12   took turns with the vehicles that we have.

13           Q.      So, generally speaking, you drive that

14   vehicle a considerable amount of time; correct?

15           A.      Yes.

16           Q.      And did you ever notice that the vehicle

17   had a tendency if you took your foot off the brake to

18   move forward without depressing the accelerator?  Did

19   you have that sense, that the car would function that

20   way prior to the accident?

21           A.      I did not have that sense.

22           Q.      All right.  So do you have a memory

23   sitting here today of --

24                   Now at the time that your foot slipped

1  off the brake you weren't operating a cell phone; is

2  that correct?

3        A.    Not that I can remember, but we don't --

4  I've already told you I'm not sure.

5        Q.    I understand.  All right.

6              So do you remember what you were doing

7  inside the car at the time your foot slipped off the

8  brake?  Were you just daydreaming?  Were you listening

9  to the radio?  Do you have any sense of what your mind

10 was occupied with?

11       A.    Listening to the radio and thinking

12 about work.

13       Q.    And how did you become aware that your

14 foot slipped off the brake?  Did it startle you that

15 your foot slipped off the brake?  Did you just all of

16 a sudden realize your vehicle was moving forward?  Can

17 you give me a sense of what was taking place inside

18 the vehicle.

19       A.    I'm sure it did startle me and I

20 immediately then pushed on the brake.

21       Q.    Now do you remember how far your vehicle

22 moved forward before you were able to get your foot

23 back on the brake?

24       A.    No.  I do not know.

1        Q.      Is it fair to say that you weren't able

2   to get your foot back on the brake in enough time to

3   prevent a collision between the front of your vehicle

4   and the back of my client's vehicle?  Is that fair to

5   say?

6        A.      Obviously, since I did tap the back of

7   her car.

8        Q.      Now you say -- you used the word "tap."

9   Why do you use that word "tap"?  What does that term

10  mean to you?

11       A.      There was no damage to my car nor hers,

12  so I'm struggling -- there was no serious impact.

13       Q.      When you say there was no damage to your

14  car, did you get out of your car after the collision?

15       A.      Yes, I did.

16       Q.      And did you then inspect your vehicle?

17       A.      Yes, I did.

18       Q.      And is it your testimony that when you

19  inspected your vehicle there was categorically no

20  damage, no paint damage, no depression, no scraping,

21  no evidence, utterly no evidence of any impact?  Is

22  that your testimony?

23       A.      My license tag was slightly at an angle

24  and that was the only damage whatsoever to my car.

1       Q.      So the license tag which is sort of a

2  white Maryland license tag --

3       A.      White or blue.  I don't recall which

4  one.

5       Q.      Let me just show you.  I haven't had it

6  marked yet but I will if you can tell me what this is

7  or not.  Do you recognize this photograph?

8       A.      You have to bring it in closer.  I can't

9  see.  It does look like the front of a Volvo.

10       Q.      Can you tell whether or not -- how about

11  now?  That might be a little better.  Can you tell if

12  that's your vehicle or not?  It has a license plate

13  HLR539.  Can you tell one way or another?

14       A.      Yes.  That is my license.

15       Q.      Does this look like your car?

16       A.      Yes, it does.

17             MR. COOPER:  Let's just have this marked

18  as Sheldon No. 2.

19             MS. CHRISTMAN:  Which number is that?

20             MR. COOPER:  Oh.  It's 1.

21             MS. CHRISTMAN:  It's the No. 1

22  photograph which will be marked as Sheldon No. 2.

23             MR. COOPER:  Yes, yes.

24             (Deposition Exhibit Sheldon No. 2 marked

1  for identification).

2  BY MR. COOPER:

3      Q.    We've just had that photograph marked,

4  ma'am, and we've marked it Sheldon 2 and it's actually

5  Photograph No. 1.

6          So there was some evidence then of

7  impact between the front of your vehicle and the back

8  of my client's vehicle, and that evidence was the

9  license plate?

10          MS. CHRISTMAN:  I'm going to object to

11  the form of the question.

12          You may answer.

13          THE WITNESS:  My license plate was

14  slightly array.

15  BY MR. COOPER:

16      Q.    Okay.  Did you ever have your vehicle

17  inspected for damage to the front of it other than

18  what you did?  In other words, did you have a mechanic

19  or an appraiser from your insurance company or any

20  third party ever look at your vehicle to give you an

21  idea of whether or not any damage was caused to it

22  from the accident?

23      A.    My car was taken to State Farm in May,

24  on May 9th, and they looked at my car and took

1    pictures at that point of any -- of my car.

2         Q.      And did you ever speak to anyone at

3    State Farm about whether or not there was any damage

4    to your vehicle?

5         A.      My husband took the car in to State

6    Farm, I had to work, and they said there was no

7    damage.

8         Q.      So did you ever make a claim under your

9    insurance for property damage to your vehicle?

10        A.      No.

11        Q.      So you never received any monies from

12   your insurance company to repair your vehicle or do

13   anything to it regarding any damage concerning this

14   accident; correct?

15        A.      Correct.

16        Q.      All right.  Before the accident happened

17   did you notice whether or not my client's vehicle

18   moved forward at all?  I guess the way I should ask it

19   is, my client's vehicle to your knowledge was stopped

20   at the time that you hit her; correct?

21        A.      I believe so, but I can't be positive.

22        Q.      But at the time of the accident it was

23   not your intention to move your vehicle forward;

24   correct?  In other words, the traffic pattern had not

1    changed to where you were desirous to move your

2    vehicle forward?

3            A.        Correct.

4            Q.        Did the police come to the --

5                      After you got out -- what happened after

6    you got out of your vehicle?

7            A.        I got out of my car.  Miss Adams got out

8    of her car.  She started yelling at me.  I asked if

9    she was okay.  She said yes.  I asked if she wanted to

10   call the police and she said of course she did.  She

11   cursed at me many times.

12           Q.        She cursed at you?

13           A.        Yes, she did.  I got back in my vehicle,

14   she got in hers, and I called the police and we sat in

15   our vehicles until the policeman arrived.

16           Q.        Can you tell me what she said to you?

17           A.        I was in such shock at the foul language

18   coming out of her mouth that no, I can't quote it and

19   I don't say those words.  I was just shocked at being

20   cussed out for basically nothing.  It was an accident,

21   but there was in my opinion no damage.

22           Q.        Did you have a chance to look at

23   Miss Adams' vehicle?

24           A.        Yes, I did.

Sheldon - Direct                                     25

1          Q.       And did you notice any damage to it?

2          A.       At the time, no, I did not.

3          Q.       What did you do exactly to examine her

4    vehicle?  Did you touch her vehicle at all or do any

5    sort of inspection of it?  I'm trying to get a sense

6    of what you did to show yourself whether or not there

7    was any damage.

8          A.       A visual inspection and I ran my hand

9    along her car, her bumper.

10         Q.       Did you do this while Miss Adams was

11   next to you?

12         A.       Yes.

13         Q.       And did she say anything to you during

14   that period of time about damage to her vehicle?

15         A.       It was more cursing at me and telling me

16   of course she wanted me to call the police.

17         Q.       Did the police eventually come to the

18   accident scene?

19         A.       Yes.  The police officer did arrive.

20         Q.       And how long after the accident did they

21   arrive?

22         A.       I believe it was about fifteen minutes?

23         Q.       And did you speak to the police officer?

24         A.       As soon as he arrived I got out of my

1    car and at that point he saw I was very pregnant and

2    he asked if I was okay, told me to get back in my car,

3    which I did.  He went to Miss Adams' car.  She did not

4    get out of her car.  And then he told us both to move

5    our cars to the side of the road.

6              Q.    How far along in your pregnancy were you

7    back then?

8              A.    Six months.

9              Q.    Were you taking any medication at the

10   time?

11             A.    No.

12             Q.    Were you feeling all right that morning?

13             A.    I had no morning sickness my entire

14   pregnancy.

15             Q.    At some point in time you gave a

16   statement to the policeman?

17             A.    I did.

18             Q.    What did you tell him?

19             A.    That we were sitting at the red light,

20   my foot slipped off the brake, my car rolled forward,

21   tapped the back of her car.  He examined both cars,

22   straightened my license tag, and he wanted to make

23   sure I was okay.  That's the gist of my conversation.

24             Q.    Did you tell the policeman that the

1   accident was your fault?

2          A.      I did not admit guilt.

3          Q.      I have the police report here that's

4   been marked as Sheldon 1 and on Page 2 of that report

5   there's a statement that appears to be attributed to

6   you.  We're going to take the police officer's

7   deposition, but I want to ask you about this.  Can you

8   see that, ma'am?

9          A.      Hold on.  I've got to come to the TV

10  because I can't read it from here.

11         Q.      Here ... how about if I read it to you.

12  It says, "Operator 2 --" that's you.  "Operator 2

13  stated that the accident was her fault.  Operator 2

14  stated she was stopped behind Vehicle 1 when her foot

15  slipped off the brake and her vehicle struck Vehicle 1

16  in the rear."  That's what the policeman says you

17  said.  Do you see that there, ma'am?

18             MS. CHRISTMAN:  Go back to your seat,

19  Ms. Sheldon, and then answer.

20             THE WITNESS:  If that's what it says,

21  then that's what it says.  I can't read it.

22             MS. CHRISTMAN:  I'll agree --

23             THE WITNESS:  It's not clear.

24                       -  -  -

Sheldon - Direct                          28

1  BY MR. COOPER:

2        Q.    Your attorney is seated right next to me

3  and I think I've read that accurately.

4              Do you remember telling the policeman

5  that the accident was your fault?

6        A.    I don't recall.

7        Q.    Do you think the accident was your

8  fault?

9        A.    My foot slipped off the brake.  I by no

10 means intended anything to occur, but my car

11 apparently did tap the back of her car.

12       Q.    So it was your fault.

13             MS. CHRISTMAN:  I'm going to object to

14 the extent that it calls for a legal conclusion.

15             MR. COOPER:  It doesn't.

16             MS. CHRISTMAN:  You may answer the

17 question over my objection, Ms. Sheldon.

18             THE WITNESS:  I've stated what happened.

19 I don't -- I don't know that it would be considered

20 fault or not.

21 BY MR. COOPER:

22       Q.    Well, my client didn't do anything wrong

23 to cause this accident; correct?

24       A.    As far as I know, no.

```
 1              MR. COOPER:  One minute.  Take a break

 2   for a second.

 3                   (Short break taken).

 4   BY MR. COOPER:

 5        Q.     Ms. Sheldon, did the license plate, the

 6   front license plate, of your vehicle come off after

 7   the accident?

 8        A.     It did not come off of my car.

 9        Q.     Was it loose or did it have to be

10   somehow manipulated by the police officer?

11        A.     As I said --

12        Q.     What did the police officer do with it?

13        A.     It was at an angle and he made it

14   straight.

15        Q.     Okay.  But it didn't come off your

16   vehicle.  Is that your testimony?

17        A.     That is correct.

18        Q.     Okay.

19              MR. COOPER:  I don't have anything else.

20              MS. CHRISTMAN:  I don't have any

21   questions.

22              Do you want to -- actually, especially

23   since this is by video conference, I would like to

24   have my client read the transcript and so we'll have
```

Sheldon - Direct                                  30

1    the Court Reporter get that sent out after the

2    deposition.

3                         -   -   -

4                    (Deposition concluded at or about

5           3:09 p.m.)

6                    (Deposition transcript was

7           presented to the witness for reading and

8           signing.)

9                         -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF DELAWARE          )
                             :  SS.
2  NEW CASTLE COUNTY          )

3

4                      **CERTIFICATION**

5        I, CAROL DiSERAFINO, Professional Reporter

6  and Notary Public, do hereby certify that the

7  foregoing deposition of **JO ELLEN CHAPEN SHELDON** was

8  held before me, pursuant to notice, at the time and

9  place indicated; that said witness was by me duly

10 sworn to tell the truth, the whole truth, and nothing

11 but the truth; that the testimony of said witness was

12 correctly recorded in machine shorthand by me and

13 thereafter transcribed under my supervision; and that

14 I am neither of counsel nor kin to any party in said

15 action nor interested in the outcome thereof.

16        I certify that the foregoing transcript

17 was presented to the witness for reading and signing.

18        WITNESS my hand at Wilmington, Delaware,

19 this 6th day of August, 2005.

20

21 _____
   *Carol Di Serafino*
22 CAROL DiSERAFINO
   COURT REPORTER-NOTARY PUBLIC
23 Cert. No. 182-PS

24